UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                        03 CR 985 (RPP)

            - v. -
                                        **OPINION AND ORDER**

MOUSTAPHA MAGASSOUBA,

                            Defendant.
----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

  Defendant Moustapha Magassouba[1] ("Defendant" or "Magassouba") moves for a

judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or,

in the alternative, a new trial pursuant to Rule 33 of the Federal Rules of Criminal

Procedure.  For the reasons discussed herein, Defendant's motions are denied.

<u>I.  Background</u>

  In a one-count indictment, Defendant was charged with conspiracy to distribute

and possess with intent to distribute one kilogram and more of heroin from in or about

January 2003 to on or about August 12, 2003, in violation of 21 U.S.C. §§ 812, 841(a)(1),

841(b)(1)(a) & 846.  On November 6, 2009, after a five-day jury trial, and approximately

one day of deliberations, the jury returned a unanimous guilty verdict for the lesser

included offense of participating in a conspiracy to distribute and possess with intent to

distribute at least one hundred grams but less than one kilogram of heroin, in violation of

21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) & 846.

---

[1]  During the course of this case Defendant was at times referred to by the nickname "Magga" or
"Maga."  Defendant's name also frequently appears with the alternate spelling "Magessouba."

At the close of the Government's evidence, Defendant moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  (Trial Transcript (hereinafter "Tr.") at 1007-11, 1019-21, 1024-26.)  Defendant argued that the evidence was insufficient for any rational jury to convict beyond a reasonable doubt, making some of the same arguments put forth in the instant motion.  Defendant's motion at that time was denied.  (Tr. at 1026.)

After the jury returned its verdict, Defendant renewed his motion for a judgment of acquittal.  On November 20, 2009, Defendant submitted his memorandum of law in support of his motion to set aside the verdict ("Def. Mem.").  On November 30, 2009, the Government submitted its memorandum of law in opposition to Defendant's motion to set aside the verdict ("Gov't Mem.").

Defendant argues first that the evidence at trial was insufficient for the jury to conclude beyond a reasonable doubt that Defendant joined a heroin conspiracy because the only evidence directly connecting Defendant to heroin was wiretap evidence consisting of intercepted telephone calls.  Although the Government provided English translations of a number of foreign language calls, offered into evidence through the live testimony of two court interpreters, Defendant argues that the meaning of both the English translations of foreign language telephone calls and English language telephone calls was ambiguous because the parties to the calls never explicitly refer to narcotics. Defendant further argues that because the Government did not call a witness to interpret the coded language in the intercepted telephone calls and testify that the conversations related to heroin, the jury was left to speculate impermissibly as to the meaning of the intercepted telephone conversations.

Defendant also argues for a new trial based on three purported errors at trial. First, Defendant argues that the Court erred in admitting evidence related to three alleged members of the heroin conspiracy:  Moussa Keita, Fanta Kaba and Mor Lo.  Defendant argues that the Government failed to show any illicit connection between these three individuals and the Defendant.  Second, Defendant argues that the Court erred in denying his request for a multiple conspiracies charge.  Third, Defendant argues that the Court erred in admitting evidence related to cocaine transactions and that the probative value of the cocaine evidence was substantially outweighed by its prejudice to the Defendant. Each of Defendant's arguments is addressed below in turn.

## II.  Rule 29 Motion for Judgment of Acquittal

Rule 29 permits a defendant to move for a judgment of acquittal after a jury has returned a guilty verdict.  Fed. R. Crim. P. 29(c).  A defendant challenging the sufficiency of the evidence supporting a conviction "bears a heavy burden."  United States v. Finley, 245 F.3d 199, 202 (2d Cir. 2001).  The jury's guilty verdict must be upheld unless the court concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).  In making this assessment, the court must view all the evidence in the light most favorable to the Government and draw all permissible inferences in the Government's favor.  United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).  The court must analyze each piece of evidence not in isolation but against the totality of the Government's case.  Id. at 131.

In support of his Rule 29 motion, Defendant correctly points out that no government witness ever saw Defendant in possession of drugs, that no drugs or drug-related evidence were recovered from Defendant and that no government witness ever saw Defendant hand a package to or receive a package from another individual.  (Def. Mem. at 4.)  Defendant therefore argues that, in order to prove Defendant's involvement in the conspiracy, the Government relied solely on wiretap evidence.  (Def. Mem. at 5.)  Because the intercepted telephone calls admitted in evidence do not explicitly discuss narcotics or narcotics-related activities, Defendant argues that absent expert testimony interpreting any alleged "code" on the wiretaps, the Government's argument that the conversations were in code led the jury to make a jump in reasoning unsupported by the evidence, and argues that the verdict was based on impermissible jury speculation as to the meaning of the intercepted calls.  (Def. Mem. at 5-6.)

A.  The Government's Evidence at Trial

DEA Special Agent Mark Grey, a Government witness, testified that in early 2003, he and a team of agents were investigating a group of West African nationals suspected of distributing heroin in and around the Harlem neighborhood of Manhattan. Agent Grey testified that, under his supervision and that of his team, a cooperating confidential informant (the "CI"), obtained various amounts of heroin from an individual named Falou Ndiaye, located in a store in the vicinity of 115th Street and Eighth Avenue in Harlem, ranging in quantity from small samples to purchases of 28 grams and 56 grams, all of which tested positive for heroin (Tr. at 556-57, 559-62).  By late April 2003, the DEA had obtained a court-ordered wiretap on a cellular telephone used by Ndiaye. (Tr. at 173:12-20.)

In the course of Agent Grey's testimony, and the testimony of six other law enforcement officers who personally participated in the investigation, the jury heard the witnesses' live testimony, consensually-recorded telephone conversations between the CI and Ndiaye, recordings of meetings made by a body wire worn by the CI, and intercepted telephone conversations from the court-ordered wiretap of a cellular telephone used by Ndiaye[2] and court-ordered wiretaps of three other targets of the investigation:  Mor Lo, Abass Dumbuya, and Sidiki Mara.  The jury also viewed a tape of video surveillance taken of a May 21, 2003 meeting between the CI, Falou Ndiaye and the Defendant.

The Government's evidence centered on Defendant's involvement in three heroin transactions that occurred on May 2, 9 and 21, 2003.

(i)  <u>May 2, 2003 Transaction</u>

On May 2, 2003, Agent Grey instructed the CI to pretend to Falou Ndiaye that he was purchasing narcotics for buyers from Boston (Tr. 188:4-17) and directed the CI to obtain two samples of heroin and one sample of cocaine from Ndiaye (Tr. at 234:22-235:13).  Commencing at 2:00 or 2:20pm on May 2, 2003, Agent Grey's team listened to a Kel transmitter worn by the CI,[3] conducted visual surveillance on the CI for approximately two hours (Tr. at 236:12-237: 10, 239:19-240:13) and also intercepted telephone conversations from the wiretap on Falou Ndiaye's telephone, some of which were played for the jury.

---

[2]        On an intercepted call between Ndiaye and the Defendant, Ndiaye stated he had more than one cellular telephone.  (<u>See</u> GX100R-212.)

[3]        Agent Grey Testified that a Kel transmitter is a microphone that transmits the voices it captures over a short distance and allows the agents to listen to conversations involving the CI in real time.  (Tr. at 175-76.)

While Agent Grey and his team were conducting surveillance of a meeting between the CI and Ndiaye on May 2, 2003 (Tr. at 240:8-13), at 3:00pm Ndiaye called Defendant and the following exchange ensued.[4]

| | |
|---|---|
| Defendant: | You wanna see me? |
| Ndiaye: | Yeah, I want something man.  You got it, *the thing* you, you, or, you got. . . you got it or not? |
| Defendant: | Yes I do. |
| Ndiaye: | [Stutters]. . . How long you can come back here? |
| Defendant: | Uhm. . . like thirty minutes.  I'll be there.  Uhm. . . [Voices overlap] |
| Ndiaye: | Yes. . . |
| Defendant: | O.K., like how. . . how many you want? |
| Ndiaye: | I don't know exactly.  I may call my customer come from out of town.  He wanna see first. |
| Defendant: | O.K.  Uhm. . . I leave here, I'ma come to you straight. |

(Government Exhibit ("GX") 100R-212) (italics indicate foreign language words in the African language Bambara).[5]

At 3:28pm, Ndiaye called the Defendant and the Defendant assured Ndiaye that he was on his way.  (GX 100R-220.)  Approximately forty minutes later, at 4:09pm, Ndiaye called Defendant again and asked "how long it takes to get here man?"  (GX 100R-230.)  Defendant responded that he would be there in five minutes.  (Id.)  A short

---

[4]       At trial, for each recording played, the Government moved both the recording and a transcript of the recording into evidence.  Government exhibit designations including "R" refer to the recording and government exhibits bearing the same number as a particular recording and including an "RT" in place of an "R" refer to the Government's prepared transcript for that recording.  Defendant stipulated that the voices attributed to him by Agent Grey on the four court-ordered wire taps were his voice.  (Tr. at 1005:16-1006:5; GX 220S.)  Defendant did not, however, stipulate to the accuracy of the transcriptions.  Therefore, for each recording, a corresponding transcript was admitted only as an aid to the jury.  (Tr. 168:2-9.)  The jury was instructed that the evidence was what they heard on the recording, not what they read on the transcript.  In this opinion, citations to recordings refer to both the recordings and the corresponding transcripts, but for convenience, when referring to both a recording and a transcript, this opinion cites only the "R" exhibit.  Direct quotes from recordings noted in this opinion are drawn from the "RT" transcript exhibits, the exact wording of which the jury was entitled to credit, and the Court does credit when drawing every permissible inference in the Government's favor as it must do on a Rule 29 motion.

[5]       Unless otherwise noted, in all quoted portions of intercepted telephone calls and body wire recordings, ellipses and bracketed comments appear in the transcript provided to the jury at trial.

time after the 4:09pm call, the CI returned to Agent Grey's car and provided two samples

of heroin and one sample of cocaine.  (Tr. at 242:25-243:10.)

     At 6:35pm, on an intercepted call between Ndiaye and the Defendant, Defendant

told Ndiaye "[w]hen he calls you tell, try to ask him what number."  (GX 100R-250.)  At

Agent Grey's instruction, the CI complained about the quality of the heroin samples on a

call between the CI and Ndiaye at 6:37pm (Tr. at 245:13-246:13; GX 100R-251).

| | |
|---|---|
| CI: | Okay.  Uh, I had 'em both checked man. |
| Ndiaye: | Yeah. |
| CI: | The first, the first one. . . the first one . . . |
| Ndiaye: | U-huh. |
| CI: | Right, the first one that you gave me. . . |
| Ndiaye: | Yeah. |
| CI: | Was, was, was was better, was better than the second one. |
| Ndiaye: | Uhuh. |
| CI: | You know um, um but I'm still looking for something a little a little bit better than. . . the, the first one was about maybe a five or six.  That's what they guy gave me.  He said it was about maybe five or six.  The other one wasn't all that good.  The second one. |
| Ndiaye: | No good. |
| CI: | Nah, the second one wasn't that good at all.  The one that we really waited for. . . |
| Ndiaye: | Uhuh. |
| CI: | The one that we waited for the longest wasn't all that good. |
| Ndiaye: | Yeah. |

(GX 100R-251.)  The next day, May 3, 2009 at 12:18pm, Defendant called Ndiaye.

| | |
|---|---|
| Defendant: | Yo, I got uhm. . . the thing a little bit on me right here.  Uhm. . . you can. . . do something with it? |
| Ndiaye: | What thing? |
| Defendant: | The one I give you yesterday.<br>[In background: noises] |
| Ndiaye: | I don't know nobody right. . . I don't got nobody right now.<br>[In background: noises] |
| Ndiaye: | The guy that I give you last. . . yesterday, he tell me. . . he call me, he say "a little bit good but. . ." [Stutters] it not what he looking for. |
| Defendant: | Alright. |

> Ndiaye:     He telling me that last night.  He tell me he keep looking, if he don't got it, he don't got nothing, he come back to me.  But he don't come back yet.

(GX 100R-266.)  The jury did not have to speculate in order to reach a reasonable conclusion about the nature of the drug transaction or the meaning of the May 2 and 3, 2003 calls – the CI gave test results for heroin samples and Ndiaye repeated the results to Defendant the following day.

(ii)  <u>May 9, 2003 Transaction</u>

On May 9, 2003, Agent Grey instructed the CI to obtain a sample and then purchase 50 grams of heroin from Falou Ndiaye.  (Tr. at 249:3-250:7.)  At 1:36pm, the CI called Ndiaye and told him that he would be coming by in a few minutes.  (GX 100R-630.)  On an outgoing call approximately one minute later from Ndiaye to Defendant, Ndiaye asked "You think you got something?"  (GX100R-631.)  Defendant responded "Yeah," and Ndiaye told Defendant "some guy call me he says he will be here like in a couple of minutes, if he comes here and he wants something I'll call you."  (GX100R-631.)  Ndiaye called Defendant's telephone at 2:05pm, but the call did not go through.  (Tr. at 254:10-255:11; GX 100R-636.)  Approximately twenty seconds after the incomplete call, Ndiaye called the Defendant, stating:  "He tell me --give me a sample.  I say I not, I'm not . . . I don't got no sample.  Uh if you wanna buy, you could buy, you could buy."  (GX100R-637.)  Upon the CI's return to Agent Grey's car, the CI advised Agent Grey that he was unable to obtain a sample and Agent Grey instructed the CI to return and purchase 50 grams of heroin.  (Tr. at 252:22-253:25.)

On the recording of the body wire worn by the CI on that day, the CI said to Ndiaye "give me fifty" and "I want a correct [f]ifty."  (GX 108R.)  On a call from Ndiaye

to Defendant at 2:12pm, Ndiaye told Defendant "bring it to . . . uh fifty." (GX 100R-640.) Defendant told Ndiaye "it's not gonna be long" and Ndiaye replied "[l]et me know what time." (Id.) On an intercepted call fifteen minutes later at 2:27pm, Ndiaye told Defendant: "Yeah. If you say twenty minutes I let him wait. You say . . . you say, if you don't say twenty minutes say something else, you tell me." (GX 100R-644.) On a call at 2:54pm, Defendant told Ndiaye: "He says it's going to take more than 20 minutes." (GX 100R-653.)

Agent Grey, as well as Detective Joseph McHugh and Special Agent Raphael Reyes, testified that the CI eventually obtained fifty grams of heroin on May 9, 2003 from Falou Ndiaye, who obtained it from an individual named Mor Lo. The jury heard a number of foreign language telephone calls and read corresponding foreign language transcripts (which were admitted through two court interpreters) between Falou Ndiaye and Mor Lo that took place between 2:35pm and 2:56pm (See GX 100RT-645; GX 100RT-655) and Agent Reyes testified that he observed Mor Lo hand a paper bag to Ndiaye inside the Kings and Queens Jewelry store in Harlem (Tr. at 808-11). From the evidence presented, the Government argued, and the jury was entitled to conclude, that Ndiaye acquired fifty grams of heroin for the CI.

(iii) <u>May 12, 2003 Telephone Calls</u>

The jury heard a call between Defendant and Ndiaye that was intercepted at 1:20pm on May 12, 2003, and included the following exchange:

| | |
|---|---|
| Ndiaye: | What do you got now? |
| Defendant: | Yeah there's uhm. . . we. . . we got a white calling card [PH] pure white calling card [PH]. |
| Ndiaye: | Good one? |
| | [In background: noises] |
| Defendant: | Yeah. |

|  | [In background: noises] |
|---|---|
| Ndiaye: | Real good? |
| Defendant: | Yeah. |
| Ndiaye: | How much? |
|  | [In background: noises] |
|  | [Pause] |
| Defendant: | Uh. . . the guy he. . . he say he gonna give me for. . . uh. . . five point eight. |
| Ndiaye: | Five point eight? |
| Defendant: | Yeah. |

(GX 100R-850.)[6]  Approximately two hours later, at 3:09pm, Ndiaye called the

Defendant.

| Ndiaye: | What happened? |
|---|---|
| Defendant: | Yeah, I talked to him but he told me to wait.  I'm trying to take uhm, more than what you asked because they don't wanna give little. . . small like that but. . . |
| Ndiaye: | Oh. |
| Defendant: | I'm trying to take uh. . . like uh. . . fifty or something. |
| Ndiaye: | Oh. |
| Defendant: | And you told me to wait uhm. . . to give him some time, he gonna come to Manhattan and [U/I]. |

(GX 100R-870.)

(iv)  <u>May 21, 2003 Transaction</u>

On May 21, 2003, Agent Grey instructed the CI to obtain a sample of heroin and

purchase 100 grams of cocaine from Falou Ndiaye.  (Tr. at 357:15-358:8.)  At Agent

Grey's direction, the CI called Ndiaye at 2:02pm, telling Ndiaye that he would come by

in ten or fifteen minutes.  (Tr. at 358:9-17; GX 100R-1419.)  At 2:16pm, twelve minutes

after the CI called Ndiaye, Ndiaye called Defendant but the call went unanswered.  (Tr. at

373:20-374:8; GX 100R-1427.)

---

[6]     Throughout direct quotes from transcripts, "U/I" indicates unintelligible and "PH" indicates phonetic spelling.  U/I and PH designations as well as all other bracketed comments are those of the transcript's preparer, which, like the transcript as a whole, were admitted only as an aid to the jury.  The jury was instructed that the evidence was what they heard on the recording, not what they read on the transcript.

In the first conversation on a recording of the body wire worn by the CI on May 21, 2003, the CI informed Ndiaye that "I need a 100 grams of coke" (GX 110R), and arrived on a price of "27."[7]  After the discussion related to "coke," the following exchange took place:

| | |
|---|---|
| CI: | Like what um I got like 2?  3?  May be 4 other spots that I'm trying to open and things like that you know?  People that afford them with they cool they get there [sic] money together they wanna get a half a key.  How long it take, you know, what's the price on that. |
| Ndiaye: | (U/I) |
| CI: | 70 |
| Ndiaye: | Last time gave you 70 |
| CI: | Ok cool, I think it's just that I'm getting so much and [stuff] like that. |
| Ndiaye: | (U/I) I gave you 70 last time maybe go (U/I) |
| CI: | I think we can get a little bit lower since I mean I'm going to buy like 500 grams. |
| Ndiaye: | Yea you know you come with money for like 500 grams.  (U/I) no one can give you price like that. |

***

| | |
|---|---|
| CI: | Oh ok . . . you got any samples, you got anything different from the last time, a little bit better.  Something?  Aite I'll let you know. |

(GX 110R) (bracketed alterations and starred omission supplied).

At 2:32pm, after the conversation between Ndiaye and the CI about "half a key" and "500 grams," Ndiaye called Defendant again.

| | |
|---|---|
| Ndiaye: | Everything alright? |
| Defendant: | Yeah, everything fine. |
| Ndiaye: | [U/I]? |
| Defendant: | Yeah I got. . .  I got a calling card [PH].  Yeah. . . [Voices overlap] |
| Ndiaye: | O. . . O.K.  Alright, call me when. . . call me when you be outside. |
| Defendant: | I'll be outside soon.  I just finished. . . [Voices overlap] |
| Ndiaye: | O.K. |

---

[7]     "You gave me what 25?  26 last time?  I don't want to haggle . . . I got 27 alright just wanna hear you got it."  (GX 110R) (omission supplied).

11

>   Defendant:     I just finished take shower, like uhm fifteen minutes I be outside. .
>   Ndiaye:        Alright.
>   Defendant:     Alright.

(GX 100R-1439.)  It is clear that the 2:32pm telephone call occurred after the discussion

of 500 grams between Ndiaye and the CI because some portions of the 2:32pm telephone

call are audible on the May 21, 2003 body wire.  (Compare GX100R-1439 with

GX110R.)

       Detective Edward Corcoran conducted visual surveillance on the CI and Ndiaye

on May 21, 2003.  (Tr. at 917:17-25.)  He observed the CI arrive on the scene and have a

conversation with Ndiaye, and then observed the CI leave the area at 2:45pm.  (Tr. at

919:19-21, 920:14-15.)  On the May 21, 2003 body wire, the CI told Ndiaye that he was

leaving to get a slice of pizza and would call back in about 20 minutes.  (GX 110R.)

After the CI left the scene, Detective Corcoran observed the Defendant approach and get

into the passenger side of a green Lexus in which Ndiaye was sitting (Tr. at 919:22-

920:7, 920:11-19) and that at 3:15pm, after he observed the Defendant enter the car, he

began to videotape the scene (Tr. at 925:18-926:9).  While Detective Corcoran was

taping, the CI returned to the scene and got into the car that was occupied by Ndiaye and

Defendant.  (Tr. at 930:11-17.)  Upon the CI's return to the car, the following exchange

between the CI and Ndiaye was captured on the body wire:

>   CI:        What's this?
>   Ndiaye:    Yeah.  A sample.
>   CI:        Ok.  This is a sample.
>   Ndiaye:    Pure white.  Yeah.  This is what you want.  Pure white.
>   CI:        Ok.  Cool.

(GX 110R.)  The green Lexus then drove to the vicinity of 135th Street and 8th Avenue

with the CI, Ndiaye and Magassouba all in the car.  (Tr. at 659, 931-32.)  Detective

Joseph McHugh followed the car and once he had the car in view, he observed Defendant return to the car.  (Tr. at 659-60.)  Neither Detective Corcoran nor Detective McHugh observed the exact time and place Defendant had left the car.  When the CI returned, he delivered 100 grams of cocaine and a sample of heroin to Agent Grey and his team.  (Tr. at 456:20-23.)

The jury did not have to speculate in order to reach a reasonable conclusion about the meaning of the May 21, 2003 telephone calls and body wire recording.  The CI requested samples of heroin from Ndiaye, for his purchase of 500 grams.  Ndiaye then called Defendant who appeared on the scene, and while Ndiaye, Defendant and the CI were seated in a vehicle, one of the other two occupants handed the CI a sample of heroin.

(v)  Expert Testimony

The Government offered the expert testimony of Special Agent Christopher Quinn of the Organized Crime Drug Enforcement Strike Force within Immigration Customs Enforcement.  Agent Quinn was qualified as an expert on the issue of cocaine and heroin distribution and prices in New York City in 2003.  (Tr. at 692:13-21.)  He testified that heroin comes in different colors, including brown, beige and white (Tr. at 695:3-7, 697:4-10) while cocaine is only white (Tr. at 698:9-10).  Agent Quinn also testified that in New York City in 2003, the price per gram of heroin was between approximately $60 and $80 (Tr. at 697:21-23) while the price of a gram of cocaine was approximately $30 or $35 (Tr. at 701:9-12).

B.  Discussion

In light of Agent Grey's testimony that he received two samples of heroin from the CI on May 2, 2003, and the May 2 and May 3, 2003 intercepted telephone conversations related to the heroin obtained by the CI on May 2, 2003, a reasonable jury could have concluded that Defendant Magassouba agreed to provide – and did provide – one or more heroin samples to Falou Ndiaye who in turn provided heroin samples to the CI.

Viewed in its entirety, a reasonable jury could have concluded from the evidence offered related to the May 9, 2003 transaction that the CI asked to buy fifty grams of heroin from Ndiaye and in response to that request, Ndiaye called first Defendant Magassouba and then Mor Lo.  A reasonable jury could have further concluded that Defendant agreed to provide the fifty grams of heroin but was unable to do so quickly enough, and Ndiaye therefore obtained the heroin from Mor Lo and then sold it to the CI. Given the timing and content of the recordings that were entered into evidence and the agents' visual observations, the jury could have reached these conclusions without engaging in speculation and without the aid of expert testimony to interpret the intercepted telephone calls.

When considered in connection with Agent Quinn's testimony, a reasonable jury could have inferred that the May 12 and May 21, 2003, references to "pure white" and "calling card" referred to heroin.  Because Agent Quinn testified that heroin comes in both brown and white varieties while cocaine is always white, the Government argued, and the jury could reasonably infer, that something referred to as "pure white" was not cocaine because there is no need to specify that cocaine is white.  Further, the jury could

14

infer that the price quoted as "five point eight" referred to $58 per gram – a price just below the average price range per gram of heroin (and not close to the average cocaine price) that Agent Quinn testified was prevailing in New York City in 2003.  Further, based on Agent Quinn's testimony as to the price of heroin, a reasonable jury would have concluded that the CI and Ndiaye's discussion of "half a key", i.e. "500 grams," at a price of "70" (GX 110R) referred to an order for heroin.  When considered together, the May 21, 2003 body wire and Detective Corcoran's testimony were sufficient for the jury to conclude that the Defendant supplied the sample of heroin that Ndiaye gave to the CI for the CI's customers' prospective purchase of 500 grams of heroin, and which Ndiaye referred to as "pure white" (Id.), at a time when Defendant was the only person in the car other than the CI and Ndiaye.  Because a reasonable jury could conclude that Defendant was involved in the heroin transaction on May 21, 2003, and could conclude that after the CI discussed the possibility of purchasing 500 grams of heroin, the first person Ndiaye called to supply a heroin sample was Defendant, a reasonable jury could further conclude that the total weight of heroin reasonably foreseeable to Defendant Magassouba as the object of the conspiracy was between 100 and 999 grams.

Defendant next argues that the Government's evidence was insufficient for a reasonable jury to conclude beyond a reasonable doubt that Defendant joined a heroin conspiracy because on May 2, 2003, Ndiaye called a known drug dealer in addition to Defendant, because numerous other individuals approached Ndiaye's green Lexus during the course of the video surveillance recorded on May 21, 2003, and because on the May 21, 2003 body wire worn by the CI, Ndiaye indicates someone named "Mamadou" was the source for at least some of the drugs provided to the CI on that day.  (Def. Mem. at

4-5.)  These arguments are without merit because they do not address the sufficiency of the Government's evidence, but rather demonstrate that Ndiaye dealt in more than one drug and had numerous sources of supply for the drugs he sold.  Each of the arguments Defendant sets forth as suggesting other culpable parties were properly put before the jury, and, in the face of some evidence suggesting other culpable actors, the jury found that the Government had proved its case beyond a reasonable doubt.  Contrary to Defendant's suggestion, this was not a verdict based on "speculation and surmise alone." (Def. Mem. at 3.); United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994). Instead, the evidence showed that Defendant had supplied a heroin sample to Ndiaye on May 2, 2003, tried to supply 50 grams of heroin to Ndiaye on May 9, 2003, and supplied a heroin sample to Ndiaye on May 21, 2003.

When viewed collectively, the testimony of the investigating officers, the expert testimony of Agent Quinn and the numerous intercepted telephone calls (in particular, the timing of the intercepted calls, which coincided with the Government's theory of the case), constituted sufficient evidence to support the jury's verdict without additional expert testimony specifically addressing any "code" contained in the intercepted telephone conversations.

### III.  Rule 33 Motion for a New Trial

Under Rule 33 of the Federal Rules of Criminal Procedure, a district court may grant a defendant's motion for a new trial if "the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[M]otions for a new trial are disfavored in this Circuit," United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995), and the defendant bears the burden of showing that a new trial is warranted, United States v. Sasso, 59 F.3d 341, 350 (2d Cir.

1995).  A court must exercise its authority to grant a new trial where there is a "real

concern that an innocent person may have been convicted."  United States v. Sanchez,

969 F.2d 1409, 1414 (2d Cir. 1992).

    A.  Evidence Related to Additional Co-Conspirators

    Defendant first argues that the Court erred in admitting evidence related to three

alleged members of the heroin conspiracy – Moussa Keita, Fanta Kaba and Mor Lo –

because the Government failed to show any illicit connection between the three

individuals and the Defendant.  As a threshold matter, Defendant's contention that the

Government must connect Defendant to each member of the alleged conspiracy is

incorrect.  In order to knowingly join in a conspiracy, a criminal defendant need not

know the identities of every other member of that conspiracy.  See United States v.

Nusraty, 867 F.2d 759, 762 (2d Cir. 1989); United States v. Gleason, 616 F.2d 2, 16 (2d

Cir. 1979).  Therefore, in order for evidence related to co-conspirators to be relevant and

admissible, the Government need not demonstrate an illicit connection between each and

every member of the alleged conspiracy, but only a connection between the unindicted

co-conspirators and the conspiracy.  Defendant acknowledges that the Government

presented evidence connecting Keita, Kaba and Lo to Falou Ndiaye and to the charged

heroin conspiracy as a whole.  (See Def. Mem. at 7-8.)  Defendant maintains that the

admission of evidence related to Keita, Kaba and Lo was unduly prejudicial to

Defendant, but the Court addressed these concerns by instructing the jury that evidence

of co-conspirators besides Falou Ndiaye was only to be considered by them in

determining whether a conspiracy existed and not in determining whether Defendant

Magassouba knowingly joined the conspiracy.  In the jury charge, the Court instructed:

> The government argues in this case that Moustapha Magassouba entered into a conspiracy with Falou Ndiaye, and that other persons were members of that conspiracy.  The evidence relating to other alleged co-conspirators was admitted in evidence, only insofar as it may have established that the conspiracy charged in the indictment existed, or to provide a full explanation of how the transactions in controlled substances were conducted.

(Tr. at 1180.)  Because the Government was only required to connect Keita, Kaba and Lo to the conspiracy and not required to connect them to Defendant personally, and because the Court instructed the jury as to the limited purposes for which it could consider the evidence presented related to co-conspirators other than Falou Ndiaye, the admission of evidence related to Keita, Kaba and Lo is not a basis for a new trial under Rule 33.

### B.  Multiple Conspiracy Request

Next, the Defendant argues that the Court erred by not giving a multiple conspiracies charge at Defendant's request.  The weight of Second Circuit authority instructs that a multiple conspiracy charge is not appropriate in a single-defendant case such as this.  See United States v. Corey, 566 F.2d 429, 431 n.3 (2d Cir. 1977); United States v. Sir Kue Chin, 534 F.2d 1032, 1035 (2d Cir. 1976).  United States v. Pinales, 14 F. App'x 100 (2d Cir. 2001), a summary order cited by Defendant, does not compel a contrary conclusion.  In Pinales, the Court held that where the district court gave a multiple conspiracy charge without objection from the Defendant, the formulation of the charge was proper and there was no error.  Id. at 102.  Pinales does not stand for the broader proposition that a multiple conspiracies charge may be required in a single-defendant case.  Further, the Court instructed the jury as to what it must find in order to convict Defendant of the charged conspiracy.  With respect to the first element of the crime, the existence of the charged conspiracy, the Court instructed the jury as follows:

> [I]f you unanimously find that the object of the conspiracy was to distribute or possess with intent to distribute heroin, that is sufficient.  It is equally important for you to understand that if you find beyond a reasonable doubt that a conspiracy existed whose objective was to distribute or possess with intent to distribute cocaine, or any controlled substance other than heroin, the first element of the conspiracy charged in this case will not be fulfilled and you must find the defendant not guilty.

(Tr. at 1178.)  The Court further instructed the jury that in order to find the Defendant unlawfully, intentionally and knowingly joined the conspiracy, the jury must find that Defendant entered into a conspiracy with Falou Ndiaye (Tr. at 1180) and that he did so with "knowledge of the objective of the conspiracy and that he took the actions in question deliberately and voluntarily" (Tr. at 1181), eliminating any potential for jury confusion based on evidence presented related to two different controlled substances and numerous alleged co-conspirators, and similarly eliminating any potential prejudice to Defendant.

      C.  Admission of Cocaine Evidence

      Finally, Defendant argues that the Court erred in admitting evidence related to cocaine transactions.  In this Court's order of October 27, 2009, the Court granted the Government's motion *in limine* seeking to introduce evidence of cocaine transactions. Nothing that occurred at trial has cast doubt on the soundness of that ruling.  Evidence of uncharged criminal activity is not considered other crimes evidence under the Federal Rules of Evidence if the uncharged crimes "arose out of the same transaction or series of transactions as the charged offense, [or] if it is inextricably intertwined with the evidence regarding the charged offense."  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)).  Here, the evidence of cocaine transactions demonstrated that delivery of a sample of cocaine on

May 2, 2003, and delivery of 100 grams of cocaine on May 21, 2003, were part and

parcel to the heroin transactions that took place during the same meetings on the same

days.  The Court instructed the jury that in order to convict the Defendant of the charged

offense, it needed to find beyond a reasonable doubt that the object of the conspiracy was

to distribute or possess with intent to distribute heroin.  (Tr. at 1178.)  From one of the

jury notes sent to the Court during deliberations, it is apparent that the jury understood

this aspect of the charge and did not consider cocaine evidence in its assessment of the

total quantity of heroin that was foreseeable to Defendant as the object of the conspiracy:

"Are we to consider the heroin transactions only with the defendant, or all the heroin

drug deals based on evidence submitted, or were referred within the conspiracy, or can

we infer what heroin they may distribute during the time frame of the indictment, January

through August?"  (Tr. at 1216) (emphasis added).  The Court replied:

> In response to the inquiries in your last note, you can only consider the
> heroin transactions for which the evidence shows beyond a reasonable
> doubt that the defendant personally participated in, and the heroin
> transactions which the evidence shows beyond a reasonable doubt that the
> defendant would reasonably have foreseen that persons he knew were
> members of the conspiracy agreed to participate in during the time frame
> of the conspiracy.

(Court Exhibit 12; see also Tr. at 1227:10-1228:9.)  Because the jury understood its

instructions as to determining the type of narcotic at issue, Defendant suffered no unfair

prejudice from the Government's use at trial of evidence related to cocaine transactions.

## III.  Conclusion

Because the Defendant has not demonstrated that he suffered prejudice because of

errors at trial and has not shown the manifest injustice necessary to grant a motion

pursuant to Federal Rule of Criminal Procedure 33, Defendant's motion for a new trial is

denied. Because the Government presented evidence sufficient for a rational jury to find

beyond a reasonable doubt that Defendant knowingly joined a conspiracy, the object of

which was to distribute or possess with intent to distribute more than 100 grams but less

than one kilogram of heroin, Defendant's motion for a judgment of acquittal pursuant to

Federal Rule of Criminal Procedure 29 is denied.

IT IS SO ORDERED.

Dated: New York, New York
       February 19, 2010

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this order were faxed to:

Natalie Lamarque
Parvin Moyne
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2206
Fax: (212) 637-2527

Avraham Chaim Moskowitz
Moskowitz, Book & Walsh LLP
345 Seventh Ave., 21st Floor
New York, NY 10001
(212) 221-7999
Fax: (212) 398-8835